UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| RANDAL WILLIAMS, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | Case No.: 1:25-cv-61 |
| v. | ) | |
| | ) | Judge Curtis L. Collier |
| UNUM LIFE INSURANCE COMPANY | ) | Magistrate Judge Christopher H. Steger |
| OF AMERICA, | ) | |
| | ) | |
| *Defendant*. | ) | |

## M E M O R A N D U M

Before the Court is a motion by Unum Life Insurance Company of America ("Defendant") to enforce a settlement agreement reached between Defendant and Randal Williams ("Plaintiff"). (Doc. 25.)  Defendant additionally seeks an award of attorney fees and costs associated with enforcement of the settlement.  (*Id.*)  Plaintiff responded in opposition (Doc. 27, 28), and Defendant replied (Doc. 29).

## I.     LEGAL STANDARD

This case is brought under the Employee Retirement Income Security Act of 1974 ("ERISA").  29 U.S.C. §§ 1001 *et seq.*  "It is well established that courts retain the inherent power to enforce agreements entered into in settlement of litigation pending before them."  *Aro Corp. v. Allied Witan Co.,* 531 F.2d 1368, 1371 (6th Cir. 1976) (citations omitted), *cert. denied,* 429 U.S. 862 (1976); s*ee also Kukla v. Nat'l Distillers Prods. Co.,* 483 F.2d 619, 621 (6th Cir. 1973). Because there has not been an entry of judgment or dismissal in the case, the case is still pending and no separate basis for jurisdiction is required for the court to enforce the settlement agreement. *See Bennett v. Prudential Ins. Co. of Am.*, No. 23-11070, 2025 U.S. Dist. LEXIS 165784, (E.D. Mich. August 26, 2025) at *4; *Jaynes v. Austin*, 20 F. App'x 421, 423 (6th Cir. 2001) ("before

entry of judgment or dismissal, district courts have jurisdiction over the subject matter of the cases pending before them"). "Public policy favors out of court settlements, even in the context of suits arising under ERISA." *John Boettcher Sewer & Excavating Co. v. Midwest Operating Eng'rs Welfare Fund*, 803 F. Supp. 1420, 1425 (N.D. Ind. 1992) (citing *Leavitt v. Nw. Bell Tel. Co.,* 921 F.2d 160, 162 (8th Cir. 1990).

"Settlement agreements are a type of contract and are therefore governed by contract law." *Bamerilease Cap. Corp. v. Nearburg*, 958 F.2d 150, 152 (6th Cir. 1992) (citing *Hageman v. Signal L.P. Gas, Inc.*, 486 F.2d 479, 487 (6th Cir. 1973). Generally, disputes regarding validity of settlement agreements are governed by state substantive law. *Id.* (citing *White Farm Equip. Co. v. Kupcho,* 792 F.2d 526, 529 (5th Cir. 1986)). However, "[f]ederal common law should govern the validity of settlement agreements resolving ERISA disputes." *Bd. of Trustees of Sheet Metal Workers Loc. Union No. 137 Ins. Annuity v. Vic Constr. Corp.,* 825 F. Supp. 463, 466 (E.D.N.Y. 1993). In practice, the distinction is rarely outcome determinative.[1] *See, e.g.*, *Bamerilease Capital*, 958 F.2d at 152; *Huffer v. Herman*, 168 F. Supp. 2d 815, 824 (S.D. Ohio 2001) ("the rules governing contract formation are so universal and well-established that the outcome in this case would be the same under either federal or state law.")

## II.     BACKGROUND

On November 13, 2025, the parties participated in voluntary mediation with Mediator Jack Townsend. At mediation, the parties came to mutually agreeable terms to settle the matter. Later that day, mediator Townsend emailed the parties a term sheet outlining the agreed-upon settlement terms and next steps. The email began: "Great to work with you today and congratulations on

---

[1] The parties apply Tennessee substantive law in their briefs, as this is where the case originated. The Court therefore applies both Tennessee law and general common-law contract principles.

another resolution through mediation." (Doc. 26-2 at 2). The term sheet instructed Defendant to send Plaintiff the standard settlement terms and release used by the parties' attorneys in the past, Plaintiff to review, sign, and return the release, and Defendant to promptly send payment.

On November 18, 2025, Plaintiff emailed Defendant payment instructions. (Doc. 26-4.) On November 24, 2025, Plaintiff filed with the Court a notice of settlement. (Doc. 23.) On December 22, 2025, the parties filed a joint status report. (Doc. 24.) This report reiterated that the matter had settled and the paperwork was being finalized. (*Id.*)

The parties were in sporadic contact, typically spurred by Defendant asking Plaintiff for a status update on signing and finalizing the agreement. (*See* Doc. 26-4.) On January 20, 2026, Defendant informed Plaintiff's counsel that Plaintiff filed a regulatory complaint stating that he would not sign the settlement agreement. (Doc. 26-5 at 7). Defendant added that, "[f]rom Unum's perspective, the parties have an enforceable settlement." (*Id.*)

On January 28, 2026, Defendant again reached out to Plaintiff's counsel for an update and warned of taking action toward enforcing the settlement. (*Id.* at 6.) Plaintiff's counsel expressed difficulty communicating with Mr. Williams and was unable to provide any substantive updates or explanations to Defendant. (Id. at 3–4.) On February 18, Defendant informed Plaintiff's counsel of plans to prepare a motion to enforce the settlement and ask for fees. (*Id.* at 3.) On February 19, Plaintiff's counsel was finally able to speak with Mr. Williams and learned he would not sign the contract because "he finds the non-disclosure and confidentiality provisions to be too restricting." (*Id.* at 2.) Plaintiff's counsel then relayed that information to Defendant. (*Id.*) On March 5, 2026, Defendant filed a motion to enforce the settlement and award associated attorney fees and costs. (Doc. 25.)

## III. <u>ANALYSIS</u>

Defendant argues that a valid, binding, settlement agreement was created by the parties at mediation on November 13, 2025. Defendant seeks to enforce the terms of this settlement. In response, Plaintiff argues that not all material provisions were agreed upon and there was no acceptance or execution of the settlement agreement. Plaintiff requests the Court instead issue a briefing schedule and allow the case to move forward.

Defendant additionally seeks attorney fees and costs associated with bringing this motion.

### A. There is a legally enforceable contract

Under federal law, a court may enforce a settlement "even where the agreement has not been arrived at in the presence of the court nor reduced to writing." *Kukla*, 483 F.2d at 621; *see also Bowater N. Am. Corp. v. Murray Mach.,* 773 F.2d 71, 76–77 (6th Cir. 1985) (citing *Odomes v. Nucare, Inc.,* 653 F.2d 246, 252 (6th Cir. 1981)); *John Boettcher Sewer,* 803 F. Supp. at 1426. "Before enforcing settlement, the court must conclude that agreement has been reached on all material terms." *RE/MAX Int'l, Inc. v. Realty One, Inc.*, 271 F.3d 633, 646 (6th Cir. 2001); *Brock v. Scheuner Corp.*, 841 F.2d 151, 154 (6th Cir. 1988) (citing *Ozyagcilar v. Davis,* 701 F.2d 306, 308 (4th Cir. 1983). "When parties have agreed on the essential terms of a settlement, and all that remains is to memorialize the agreement in writing, the parties are bound by the terms of the oral agreement." *RE/MAX Int'l.*, 271 F.3d at 646 (first citing *Brock,* 841 F.2d at 154 and then *Kukla,* 483 F.2d at 621).

It is "undisputed" and a "fundamental principle" that "the decision to settle a case rests with the client alone." *United States v. U.S. Currency in the Sum of Six Hundred Sixty Thousand, Two Hundred Dollars*, 423 F. Supp. 2d 14, 20 (E.D.N.Y. 2006) (citing *United States v. Int'l Bhd. of Teamsters*, 986 F.2d 15, 19 (2d Cir. 1993). "While this principle is well established, 'if an

4

attorney has apparent authority to settle a case, and the opposing counsel has no reason to doubt that authority, the settlement will be upheld.'" *Id.* (quoting *Fennell v. TLB Kent Co.*, 865 F.2d 498, 502 (2d Cir. 1989)).

"The burden of establishing the elements of a contract is on the party asserting the existence of one." *Huffer*, 168 F. Supp. 2d at 823. "The basic elements of contract formation are an offer and acceptance." *Id.* at 824 (citing Restatement (Second) of Contracts § 22 (1981)). "A valid settlement agreement also requires a meeting of the minds." *Id.* "While a contract (offer and acceptance) is usually expressed in words, it may be implied from conduct." *Murray v. Grissim*, 40 Tenn. App. 246, 250 (Tenn. Ct. App. 1956); *see also* Restatement (Second) of Contracts § 19 ("Conduct may often convey as clearly as words a promise or an assent to a proposed promise."). "The principle that objective manifestation of intent is controlling in contract formation is very well established." *Northland Capital Corp. v. Silver*, 735 F.2d 1421, 1427 n.7 (D.C. Cir. 1984).

Here, Plaintiff does not challenge the interpretation of any particular term or provision, but rather whether Plaintiff demonstrated assent sufficient to create a binding contract. Plaintiff argues the parties never reached agreement on the scope of the confidentiality and non-disclosure provisions, and that these provisions were material. Plaintiff further asserts that, because there was no written release, no valid or enforceable settlement contract was created. (Doc. 28 at 4.)

But Plaintiff's actions speak otherwise. On November 24, 2025, Plaintiff filed a notice of settlement with the court. (Doc. 23.) The substance of the letter, in its entirety, reads: "We represent Plaintiff Randal Williams in this matter. Please be advised that this matter has settled, and the parties are in the process of exchanging settlement documents. The appropriate dismissal documents will be filed shortly." (*Id.*)

5

Defendant explicitly used the past tense, that the parties had "settled." No conditional language was used. This comports with the email sent by the mediator after the parties met for mediation of the case. The email starts with "congratulations on another resolution through mediation." (Doc. 26-2.) These documents clearly imply a meeting of the minds occurred, and a valid contract had been executed. *See RE/MAX Int'l.*, 271 F.3d at 646 ("When parties have agreed on the essential terms of a settlement, and all that remains is to memorialize the agreement in writing, the parties are bound by the terms of the oral agreement.") (First citing *Brock,* 841 F.2d at 154 and then *Kukla,* 483 F.2d at 621).

Plaintiff's and Defendant's counsel have negotiated numerous similar agreements on behalf of their clients. (Doc. 26 at 2; Doc 26-2 at 2). Defendants have a standard form agreement, of which Plaintiff's counsel is presumably familiar with the key terms. This fact tends towards enforcing the settlement agreement. *See* Restatement (Second) of Contracts § 202 ("Wherever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade."). There are no allegations of mutual mistake or lack of awareness of the nondisclosure and confidentiality provisions of the settlement release or their meaning. The evidence suggests that Counsel simply did not realize the restrictive implications they might have for his client's other legal proceedings or that his client would object to them.

Although Plaintiff may now disapprove of certain settlement terms, Plaintiff does not assert that his counsel did not have authority to enter into the settlement on his behalf. Counsel had apparent authority to negotiate and execute a settlement, and there was no reason for Defendant to doubt it. *See Capital Dredge & Dock Corp. v. Detroit*, 800 F.2d 525, 530 (6th Cir. 1986) ("Generally, when a client hires an attorney and holds him out as counsel representing him in a

matter, the client clothes the attorney with apparent authority to settle claims connected with the matter."). Even if an attorney acts contrary to their client's express instructions, the third party is still entitled to enforcement of a settlement unless there was reason to believe the attorney lacked authority to negotiate the settlement. *Id.* at 530–31. In such a case, the proper remedy is instead for the client to sue their attorney for professional malpractice. *Id.*

Further, by submitting the notice to the court, Plaintiff provided objective outward manifestation of intent. A reasonable person would not think that essential terms of the agreement were still under negotiation. Nor has Plaintiff provided any evidence that, behind the scenes, negotiations were in progress or Defendant otherwise knew that the settlement terms were not agreed upon. In an email exchange approximately two weeks after mediation, Plaintiff's counsel told Defendant, "[o]ther than this slight delay in getting the paperwork signed, I don't anticipate any other issues." (Doc. 26-5 at 12.) And two weeks after that, Plaintiff's counsel emailed, "I am still waiting on my client. He isn't backing out from the settlement, but he hasn't returned the signed documents to me yet." (*Id.* at 8.)

While it is true that there is not a written release, as contemplated by the mediation term sheet, the objective manifestation of the parties indicates that the remaining terms were not material or essential to the greater settlement agreement. Additionally, the term sheet does not indicate that Plaintiff was still deliberating on whether to accept the offer. Instead, it states, "[a]fter review and acceptance a fully signed release will be returned to defense counsel after which the defense team will move forward with payment . . . ." (Doc. 26-2 ¶ D.) The usage of the word "will" is instructive. As used in this sentence, as well as throughout the course of the term sheet, it is a direction to the parties on what they shall, or are expected, to do. It does not contemplate

7

ongoing negotiation; it is in the context of a finalized agreement that merely requires memorialization in writing.

In fact, a month later, on December 22, 2025, the parties filed a joint settlement status update, informing the Court that "[t]his matter settled on November 13, 2025," and "Plaintiff is expected to sign and return the settlement release shortly." (Doc. 24 ¶¶ 1, 3.) Once again, no conditional language was used in relation to settlement. Further, this was a joint filing, meaning the parties conferred and agreed upon the language of the status update, and both signed the document. (*Id*. at 1–2.) It appears that Plaintiff even drafted the text. (Doc. 26-5 at 10.) Thus, the filings, on their face, signify a meeting of the minds and mutual assent. *See Moody Realty Co. v. Huestis*, 237 S.W.3d 666, 674 (Tenn. App. 2007) ("The parties' actions . . . can establish mutual assent.").

Plaintiff's representations to Defendant objectively manifest an intent to be bound by the settlement agreement. Most obviously, on November 18, just five days after mediation, Plaintiff emailed Defendant payment instructions for where to send the settlement check. (Doc. 26-4 at 2). Notably, the terms sheet reads, "[a]fter review and acceptance a fully signed release will be returned to defense counsel *after which* the defense team will move forward with payment as expeditiously as possible." (Doc. 26-2 ¶ D (emphasis added).) Payment explicitly comes after, and is premised upon, acceptance.

For the reasons stated above, the actions and representations of the parties, along with the totality of the circumstances, persuade the Court that there was a meeting of the minds, a valid settlement contract was created, and it is in the Court's authority to enforce it.

**B.     Defendant is entitled to attorney fees**

Defendant asserts that it is entitled to attorney fees incurred in enforcing the settlement agreement.  (*See* Doc. 26 at 6.)  In an ERISA action, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."  29 U.S.C. § 1132(g)(1).  Congress has not "seen fit to create any kind of statutory presumption regarding the payment of attorney fees in cases of this type" and the Court of Appeals for the Sixth Circuit "recognizes no presumption as to whether attorney fees will be awarded."  *Foltice v. Guardsman Prods., Inc.*, 98 F.3d 933, 936, 939 (6th Cir. 1996).  Courts in the Sixth Circuit are generally guided in their approach by five non-statutory, non-dispositive factors.  *Id*. at 936–37.  These are:

> (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and (5) the relative merits of the parties' positions.

*Id*. (quoting *Sec. of Dept. of Labor v. King*, 775 F.2d 666, 669 (6th Cir. 1985)).

**1.     Degree of culpability or bad faith**

After reviewing communications between the parties (Doc. 26-5), the Court finds Plaintiff's counsel was genuinely attempting to settle the case and have his client sign the documents.  This was not a case of intentional delay.

However, there appears to have been a substantial problem with communication between Plaintiff and Plaintiff's counsel.  Plaintiff ostensibly did not believe that there was a binding finalized settlement, as evidenced by his refusal to sign the document and having his attorney contest it in the present manner.  Plaintiff's counsel, on the other hand, did believe a binding settlement had been executed, as evidenced by the two court filings, sending payment instructions, and other representations in emails to opposing counsel.  Communication was so broken that

Defendant learned Plaintiff was not signing the settlement agreement before Plaintiff's counsel became aware of this decision. (*Id*. at 6 ("This is news to me. I will contact my client and follow up with you as quickly as possible.").)

Mediation occurred on November 13, 2025. It was not until January 20, 2026, over two months later, that Defendant first learned that Plaintiff would not sign the agreement. Then, it was not until February 19 (three months after mediation), that Plaintiff's counsel was able to reach his client and learn the reason he would not sign, and in turn inform Defendant of the same.

During this time, Defendant followed up with Plaintiff's counsel on multiple occasions via email requesting a status update and attempting to finalize the agreement. (*see generally* Doc. 26-5.) At all times, Plaintiff's counsel reiterated his client's intent to sign the agreement and raised no objections. (*See id*. at 12 ("Other than this slight delay in getting the paperwork signed, I don't anticipate any other issues."); *id.* at 8 ("He isn't backing out from the settlement."); *id.* at 5 ("I am trying to get my client to sign the release."); *id.* at 4 ("I don't think the settlement is dead from his perspective.").)

Upon learning Plaintiff would not sign, Defendant stated its position that there was a binding contract and warned Plaintiff's counsel on multiple occasions that it would seek court enforcement of the settlement if there was no resolution soon. (*Id*. at 5.) Despite Plaintiff twice informing the Court in writing that the case had settled, and clearly indicating as such in communications with Defendant, Plaintiff then reversed course and took the position that no settlement existed. This constitutes acting in bad faith.

Plaintiff unilaterally caused a misunderstanding as to the status of the settlement and a substantial delay in finalizing it. This resulted in additional expense to Defendant, which had to expend time and resources to enforce the agreement.

### 2. Ability to satisfy an award

The monetary value of the settlement between the parties remains confidential.  However, upon settlement, Defendant will presumably have funds sufficient to satisfy the award of attorney fees.

### 3. Deterrent effect

In addition to the temporal elements, Plaintiff made multiple inaccurate and contradictory written representations both to the Court and to opposing counsel regarding the status of the settlement agreement.  The Court sees value in deterring future litigants from this sort of conduct. Effective communication between clients and their counsel, between counsel and co-counsel, and between counsel and the Court are fundamental to the effective and efficient functioning of our judicial system.  Granting the motion for attorney fees will disincentivize future litigants from reneging on settlement agreements.

### 4. Common benefit or significant legal questions

The Court does not address the fourth factor as it is not relevant to this inquiry.  The merits of the settlement enforcement dispute do not turn on the resolution of an ERISA-specific question.

### 5. Relative merits of the parties' positions

As discussed above, the parties entered into a valid settlement agreement.  The evidence is overwhelming in favor of Defendant's position, most starkly demonstrated by Plaintiff's own filings and communications.  Plaintiff argues he was simply exercising his right to review the settlement release and declined to accept.  (Doc. 28 at 5.)  Plaintiff ignores, however, that settlement terms were agreed upon at mediation, by parties with authority to do so, Plaintiff subsequently made multiple representations that the terms were sufficient, and let months pass before raising any notion of disagreement.

11

## IV.    CONCLUSION

The Court finds that the parties entered into a valid settlement agreement.  *See RE/MAX Int'l.,* 271 F.3d at 646 ("[S]ummary enforcement of a settlement agreement has been deemed appropriate where no substantial dispute exists regarding the entry into and terms of an agreement.")  The Court will direct the parties to file a stipulation for dismissal by **June 5, 2026**.

The Court further finds that reasonable attorney fees are appropriate.  The Court will direct Defendant to file with the court a ledger of work performed related exclusively to enforcement of the settlement agreement.

**ENTER:**

**/s/**
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**

12